**Opinion issued August 4, 2016**



In The

# Court of Appeals

For The

# First District of Texas

―――――――――――――

## NO. 01-16-00104-CV

―――――――――――――

## IN THE INTEREST OF J.J.G., L.K.G., H.A.G., AND A.G.G, CHILDREN

―――――――――――――

**On Appeal from the 313th District Court**
**Harris County, Texas**
**Trial Court Case No. 2014-00610J**

―――――――――――――

### MEMORANDUM OPINION

In this accelerated appeal,[1] appellants, M.G. and J.R.G., challenge the trial court's order, entered after a bench trial to a master, awarding the Department of Family and Protective Services ("DFPS") permanent managing conservatorship of

---

[1]     *See* TEX. FAM. CODE ANN. § 263.405(a) (Vernon 2014); TEX. R. APP. P. 28.4.

their four minor children, J.J.G., L.K.G., H.A.G., and A.G.G.[2] (collectively, "the children") and denying them possessory conservatorship. In two issues, M.G. contends that the trial court erred in appointing DFPS as the children's permanent managing conservator[3] and in not approving the "master's recommended judgment without hearing more evidence."[4] She also contends that Texas Government Code section 54.817 "den[ies] [her] due process protections" in the instant case.[5] In two issues, J.R.G. contends that trial court erred in appointing DFPS as the children's permanent managing conservator.[6]

We reverse and remand.

---

[2]  At the time of trial, J.J.G. was five years old, L.K.G. was four years old, H.A.G. was three years old, and A.G.G. was two years old.

[3]  *See* TEX. FAM. CODE ANN. § 263.404 (Vernon Supp. 2015). In the alternative, M.G. contends that the trial court erred in not appointing her as the children's possessory conservator. *See id.* § 153.191 (Vernon 2014).

[4]  *See* TEX. GOV'T CODE ANN. § 54.808 (Vernon 2013) ("A judge may refer to a master any civil case or portion of a civil case brought . . . under Title 1, 2, 3, 4, or 5, Family Code[.]"); *see also id.* §§ 54.816 ("After a hearing is conducted, the master shall send to the referring judge all papers relating to the case and the written findings of the matter."), 54.817(a)–(b) (Vernon 2013) ("After a court receives the master's report, the court may adopt, modify, correct, reject, or reverse the master's report . . . . If a judgment has been recommended, the court may approve the recommendation and hear more evidence before making its judgment."); Judicial Dist. Ct. Harris Cty., Juvenile Trial Div. Loc. R. 3.6 (referrals to master/associate judge).

[5]  *See* TEX. GOV'T CODE ANN. § 54.817.

[6]  *See* TEX. FAM. CODE ANN. § 263.404.

**Background**

On February 5, 2014, DFPS filed a petition, seeking managing conservatorship of the children and termination of the parental rights of M.G. and J.R.G. The case was tried before a master,[7] who found that DFPS "did not meet its burden" to obtain permanent managing conservatorship of the children. The master ordered that M.G. and J.R.G. be named joint managing conservators of the children and M.G. "be designated the primary joint managing conservator." And it ordered that the children be immediately returned to their parents. DFPS then filed a Motion to Stay the Return of the Children and a Motion for Reconsideration of the Master's Ruling with the trial court, which then appointed DFPS as the permanent managing conservator of the children and denied M.G. and J.R.G. possessory conservatorship. The trial court did not terminate the parental rights of either M.G. or J.R.G.

At trial, the master admitted into evidence the affidavit of DFPS Investigator Wanda Smith. She testified that on January 23, 2014, DFPS received a referral that A.G.G., who was seven months old at the time, had been physically abused by an "unknown perpetrator." A.G.G. had been under the care of "several different caregivers," and M.G. could not provide an explanation for A.G.G's injuries, which included "brain bleeding, broken bone[s], and bruising." A.G.G.'s injuries

---

[7]    *See* TEX. GOV'T CODE ANN. §§ 54.808, 54.810 (Vernon 2013), 54.816.

constituted a "non-accidental trauma" and were "consistent with abuse and/or neglect."

Smith further testified that M.G., "a single mother," is employed and lives with her four children. M.G. "denied . . . drug and alcohol abuse, psychological history, criminal [history,] and CPS history" and "does not take any medication." Smith described A.G.G.'s siblings, J.J.G., L.K.G., and H.A.G., as "awake, alert[,] and very active," and they "appeared to be healthy and developmentally on target for their ages." And J.J.G., L.K.G., and H.A.G. showed "no signs of abuse or neglect."

Dr. Reena Isaac, a physician on the child protection medical team at Texas Children's Hospital, testified that she examined A.G.G. after M.G. had brought him to the hospital on January 23, 2014. Isaac diagnosed him as "a victim of abusive head trauma," noting that he had "several skeletal injuries," two subdural hematomas, a "cerebral contusion on the left side" of his head, "significant retinal hemorrhages in both of [his] eyes," and "scratches on his back." More specifically, A.G.G. had a "recent" subdural hematoma "around the back of his head" and a "more remote" one on the "frontal area[]" of his head, indicating that he had "suffered head trauma on more than one occasion." The "recent" subdural hematoma had likely occurred within one to three days of his arrival at the hospital, while the "more remote" subdural hematoma had likely occurred at least several weeks prior. Isaac

4

noted that the subdural hematomas were "markers of [a] head injury," caused by "acceleration/decelerations forces" applied to A.G.G., i.e., "the child's head [was forced to] mov[e] very rapidly and then stop[ped] suddenly." In other words, someone could have "shak[en]" him or "shak[en]" and "throw[n] [him] onto a bed."

Dr. Isaac noted that M.G. indicated that on January 18, 2014, five days prior to his arrival at the hospital, A.G.G., who had been "strapped" into his car seat, "fell" when the car seat "dislodged" while M.G. was driving her car (the "car seat incident"). A.G.G., however, had remained "strapped within the car seat," was "fine," and properly ate and drank afterwards. M.G. also stated that on January 19, 2014, four days prior to his arrival at the hospital, A.G.G. had fallen off of a bed while at home with M.G. M.G. "consoled" him after the fall and did not see any "obvious changes" to him at that time. Isaac explained that neither of these incidents would have caused A.G.G.'s subdural hematomas because they could not have generated "the rapid acceleration and deceleration" forces necessary "to cause the hematomas that [had] occurred in his brain." Likewise, these incidents could not have caused the "retinal hemorrhaging" found in A.G.G.'s eyes.[8]

M.G. also told Dr. Isaac that on January 21, 2014, two days prior to his arrival at the hospital, A.G.G., after he had "returned home" from the care of a "babysitter,"

---

[8]    Dr. Isaac opined that it would have been impossible for a parent to have been able to detect the "retinal hemorrhaging" "just [by] looking at the child."

cried for "prolonged periods of time and [was] irritable." Although irritability could be "consistent with a head injury," Isaac explained that A.G.G. also had, at the time, a cough which could have been the source of his "irritability." However, when A.G.G. "started vomiting" two days later, on January 23, 2014, M.G. took him to the hospital, which Isaac opined was an "appropriate" action for M.G. to take at the time.[9]

Dr. Isaac further testified that A.G.G. had suffered "fractures" to both of his "distal tibias," namely, "the long bones of the legs near the ankles," "sclerosis or an injury to one of the bones within his left . . . foot," and "an impaction fracture on his right radius." The fractures to the tibias, approximately "7 to 10 days old,"[10] likely occurred at the same time, as the result of "a direct . . . application of force in a twisting motion." And the force that caused the fractures was greater than any force

---

[9] The trial court admitted into evidence a Physician's Statement, which reflects that M.G.'s sister-in-law, Veronica, had cared for A.G.G. for six hours on January 20, 2014 while M.G. was at work. On that day, A.G.G.'s "cough symptoms slowly began," but he "slept well through the night." The next day, on January 21, 2014, M.G.'s "friend," Nelly, cared for A.G.G. for six and a half hours while M.G. was at work. On that day, A.G.G.'s "cough symptoms continued," but he ate and drank "adequate[ly]." Nelly, however, reported to M.G. that A.G.G. had "cried for prolonged periods [of time] and appeared irritable"; thus, and she was concerned about a possible "sore throat." On January 22, 2014, Veronica cared for A.G.G. for nine hours. On that day, A.G.G. showed decreases in his eating and drinking, "cr[ied]" and "tremble[d]," and "slept for longer periods of time." (Internal quotations omitted.) After A.G.G. had vomited four times the next day, January 23, 2014, M.G. sought medical treatment for him.

[10] Dr. Isaac opined that the "impaction fracture on [A.G.G.'s] right radius" likely occurred within the two weeks prior to his arrival at the hospital.

6

required for the "normal care of a child." Although M.G. had reported to Isaac that A.G.G "may have gotten [his] legs caught in [his] crib," such an occurrence would not have explained his leg injuries, which were more "serious" and "[i]ntentionally done." Isaac noted that although A.G.G. had been seen by his primary care physician a week prior to his arrival at the hospital, the fact that the physician did not identify the tibia fractures was not unusual. And Isaac would not have expected "a layperson," such as a parent, to notice the fractures either.

Finally, Dr. Isaac, noting that A.G.G. had stayed in the hospital for three weeks, opined that A.G.G.'s siblings likely did not cause any of his injuries, with the possible exception of "some of the bruises" or "scratches on [his] back," which were "superficial" in nature. A.G.G.'s injuries were "serious," would have been caused by "significant force," and were likely caused by an adult. Although Isaac could not say "who" had specifically injured A.G.G., she opined that it was likely "a caregiver."[11] Ultimately, Isaac opined that A.G.G. had suffered from a "non-accidental trauma" and "child abuse," and A.G.G. "could have died," had treatment not been sought. She further noted that A.G.G.'s siblings had been examined by the medical staff at the hospital and found to be healthy.[12]

---

[11]  M.G. reported to Dr. Isaac that in addition to herself, her sister-in-law, Veronica, and her friend, Nelly, had cared for A.G.G. during the five days prior to his arrival at the hospital.

[12]  The Physician's Statement also indicates that M.G. "works in a restaurant" and has "help from her family (brothers and sisters in law and friend) in caring for her

DFPS caseworker Nicole Franco, who was assigned to the children's case in January 2015, testified that she had seen the children seven times prior to the time of trial. M.G. indicated to her that "three individuals," herself, Veronica, and Nelly, had had access to A.G.G. during the time that he was likely injured.

In regard to the children, Franco explained that each child has his or her own "unique special needs." For instance, J.J.G. currently "requires speech therapy" and "participates in individual play therapy"; L.K.G. requires "speech therapy and individual play therapy"; H.A.G. "requires speech therapy," is not "potty trained," and requires "PPCD," which is "[s]upport service[] through . . . school"; and A.G.G. requires "continue[d] treatment" by an ophthalmologist, additional surgery "around the age of five" related to his eyes, and "occupational, physical, and speech therapy." Franco noted that although J.J.G., L.K.G., and H.A.G., when they entered into the care of DFPS, showed no "sign[s]" of physical abuse, they were "diagnosed with anemia" and J.J.G. was "under weight." However, these issues were not "severe enough" for DFPS "to have remove[d] the children." Franco also noted that J.J.G. and L.K.G., who were five years old and four years old, respectively, did not "want to go home to" M.G. or J.R.G. And she opined that it is in the best interests of the

children." Also, the family has no "[h]istory of drug[] or alcohol abuse," "mental illness," "domestic violence," "past or current involvement with law enforcement," or "past or current involvement with CPS."

8

children for "parental rights to be terminated" or "[f]or the children to remain in the custody" of DFPS.

In regard to J.R.G., Franco discussed his Family Service Plan with him, but he did not provide "verification" to DFPS about his employment or housing. Franco did visit J.R.G.'s home, noting that the "structure of the home" that J.R.G. shares with his wife, a woman other than M.G., satisfies DFPS. However, J.R.G.'s "wife does not want the children there" and "doesn't want to take the responsibility of caring for [the] four children." Franco noted that J.R.G. did not attend a required "permanency hearing on May 19, 2015." And he had attended only three out of approximately twenty-two scheduled visits with the children since the time that he had been served in the instant case. J.R.G. had also failed to provide DFPS with certification of his participation in parenting classes, although he had indicated to Franco that "he had done some of the classes . . . [and] only had a few more of them to do." Moreover, although J.R.G did "participate[] in [the required] psychosocial assessment," he had not "participated in family therapy."

Franco cited J.R.G.'s lack of "active[] participat[ion]" and a lack of "desire to care for all four of his children" as DFPS's "concern[]" about returning the children to him. She noted that because J.R.G. "doesn't have a place to go with all four children," DFPS is concerned that he will simply "return the children" to M.G. And Franco expressed concern that J.R.G. had not "consistently been a part of the

children's lives," had not "provided them with financial support," and had not "consistently visited with them or formed a bond with them."

Franco further testified, in regard to M.G., that she, under her Family Service Plan, was required to "participa[te] in and successfully complete individual therapy." She was initially "discharged" from "individual therapy sessions" "due to minimal progress," but DFPS referred her "for more therapy," and at the time of trial, she was still participating. M.G. had also completed her required "psychosocial evaluation," completed her required parenting classes, and provided DFPS with certification of her completion of her classes. And she continued to work on implementing the parenting "skills" she learned during her "family therapy sessions" with the children. When Franco last visited with M.G., approximately one month before trial, M.G. indicated that she would soon be "transition[ing]" into a two-bedroom apartment. And she noted that if the children were returned to her, she "intended to use a day care center" while she was at work. Franco also noted that M.G. had "consistently" attended her visits with the children and had "no CPS or criminal history." Further, M.G. had provided DFPS with "pay stubs" to verify her employment.

Franco cited M.G.'s judgment in terms of "the children's care,"[13] including her decision to "[l]eav[e] the[] [children] with inappropriate caregivers," the car seat

---

[13] On cross-examination, Franco admitted that she had not observed any of M.G.'s scheduled visits with the children, nor did she attended any of M.G.'s family therapy sessions.

incident, and the "falling off the bed" incident involving A.G.G., as the reason why DFPS was "concern[ed]" about returning the children to M.G. Franco also noted that there "is [still] an open [law enforcement] investigation regarding the injuries" to A.G.G. and M.G. "is one of the suspects." However, Franco admitted that M.G. has never refused to speak with law enforcement officers about A.G.G. and had in fact spoken with them. M.G. had also willingly spoken to "the social worker at the hospital" and other DFPS investigators. And Franco noted that "[n]o one has [ever] been charged . . . for [a] crime" related to A.G.G.

Finally, Franco opined that both Veronica and another woman, Norma, were "inappropriate" caregivers for the children. It appears from the record that M.G. had suggested Norma as a possible placement for the children after A.G.G. was injured, but Franco argued that such a placement would have been "[in]appropriate" because "[t]here was an individual in [Norma's] home who had a [recent] DWI." On cross-examination, however, Franco admitted that DFPS, while acting as temporary managing conservator of the children, had actually "placed" A.G.G. with Norma for "[f]our months" after he was injured. And while placed with Norma, A.G.G. had not been "injured," and his needs had been met.

Franco's concerns about Veronica seem to center on her possible role in injuring A.G.G., that DFPS "has never been provided with appropriate contact information to speak with [her]," and that M.G has not expressed "concern[]" about

11

leaving the children in Veronica's care. On cross-examination, however, Franco admitted that a "CPS investigator" had "spoke[n] to Veronica" and DFPS had "actually approved placement of the children with [her]" after A.G.G. was injured. In fact, after a visit to Veronica's home, DFPS had "no safety concerns," and Franco noted that Veronica has "no criminal or CPS history" and DFPS had completed "[a] background check" on her.

Dianne Del Sol, the owner of the day-care facility that the children currently attend, testified that when J.J.G., who was almost four years old, "started" at the facility, he was "very shy," "not capable of having social interactions with the rest of the children," "spoke very little English," "did not know his shapes, colors, [or] numbers," "did not know how to write his name," and was not "potty trained." However, he "could speak Spanish," was "verbal in the Spanish language," and did not have a "speech delay." Del Sol opined that there was "nothing wrong" with the fact that J.J.G. was "withdrawn to himself, doing his own activities," but he, at his age, should have been "developing social connections with others."

Del Sol further testified that, initially, L.K.G., at almost three years old, had "emotional outburst[s]" and "would cry for no reason." Also H.A.G., who was "less than two years old" when she started at the day-care facility, was "difficult to deal with." She would "sit there and just cry with her mouth hanging open and slobber dro[o]ling down," and she could not be consoled. Del Sol noted, however, that such

12

behavior could have been occurring due to the fact that H.A.G. "possibl[y]" missed her mother. On the other hand, A.G.G., who was less than one year old when he began at the day-care facility, did not have crying "outbursts" and "easily interact[ed] with the other children." However, he "had a very difficult time walking and his vision is impaired." Del Sol opined that it would have been "stressful" on the children to have been "taken [away] from the only mother [that] they knew."

Del Sol explained that, while in the care of DFPS, J.J.G., L.K.G., and H.A.G. have received speech therapy, and A.G.G. has received therapy for "walking." And the children, at the time of trial, were no longer experiencing delays in development. J.J.G. is "very outgoing," "[s]peaks well,"[14] and "knows his colors, shapes, [and] numbers." L.K.G. is "doing well," "does her class work," and "interacts with her friends." H.A.G. "still has a lot of . . . emotional distress," but "[n]ot nearly to the [same] extent." And A.G.G. is "very well adjusted," although he "struggles with [his] vision" and "his walking is a little uneven," which requires him to be watched "very closely." Del Sol admitted, however, that A.G.G. is also a "small toddler" who is simply "not steady on his feet." And the children, in general, are not "difficult to keep up with."

Gabriela Morgan, a psychotherapist with Valentia Bilingual Therapy Services, PLLC, testified that M.G., while this case was pending, had attended both

---

[14] Del Sol noted that J.J.G. still speaks Spanish with his foster parents.

individual counseling and family therapy with her, approximately once a week, for more than a year. Some of M.G.'s scheduled visits with the children had also taken place "through [Morgan's] service."[15] And, at the time of trial, she was still conducting family therapy sessions with M.G. and the children. Morgan opined that J.J.G. was "bonded" with M.G., although she had not seen the other children "cry for" their mother. And she explained that M.G. has "consistent[ly]" and "time[ly]" attended all of her therapy sessions and her "behavior in the session[s] [is] cooperative and attentive."[16]

M.G. initially told Morgan that she had "[n]o idea" "how her baby got hurt" and A.G.G. had "just woke up crying, which was unlike him and [she] took him to the doctor." However, overtime, as M.G. progressed in therapy, she indicated that she believes that Veronica hurt A.G.G.[17] This concerned Morgan because M.G., two or three months prior to Morgan's testimony, had also indicated that her relationship

---

[15] The master admitted into evidence a portion of Morgan's notes from her therapy sessions with M.G. In her notes, Morgan indicates that she first met with M.G. on May 20, 2014.

[16] In her therapy notes, Morgan describes M.G. as "very active and responsive."

[17] In her therapy notes, Morgan indicates that M.G. explained to her that when "she went to pick up her children," Veronica "told her there may be something wrong with" A.G.G. because he was "crying a lot." After she took the children home, M.G. "noticed her baby was sleeping too much." And "when he awoke," A.G.G. "vomited and continued to vomit." M.G. "became concerned and decided to take him to see a doctor."

with Veronica was "close," "they talk[ed] a lot," and Veronica was "one of her support systems."[18]

M.G. "has not said anything" nor done "anything" that has "caused [Morgan] to believe" that M.G. caused A.G.G.'s injuries.[19] And Morgan explained that M.G. has repeatedly told Morgan that "she did not hurt" A.G.G. Morgan did note that M.G. does become "overwhelmed" and "highly stressed" when around the children. However, she opined that M.G. is "not homicidal," "suicidal," or "aggressive."[20] And Morgan characterized M.G.'s "risk of VIOLENCE" to be "very low or absent."

In regard to M.G.'s ability to care for the children, Morgan testified that M.G. "struggles" because "when she is with one [child] she can't seem to direct her attention to anything else and that's when the kids start roaming and moving around and doing other stuff." However, M.G. "cares [for] and loves" her children, and her "love for her children seems genuine." And M.G. was "devastated" by A.G.G.'s injuries. When Morgan discussed with M.G. the possibility of changing her work

---

[18] During trial, however, Morgan also testified, "No," when asked, "Would it concern you if Veronica was identified as the prim[ary] support for [M.G.]?"

[19] In her therapy notes, Morgan states that M.G. denied injuring A.G.G. on numerous occasions and "the possibility of [M.G.] having been the one to hurt her child[] is low." She also indicates that M.G. denied "any kind of domestic violence in the home." And M.G. "has no history of assaultive behavior" or "self injurious behavior."

[20] Morgan further testified that M.G. has not required any medication, and in her therapy notes, Morgan states that M.G. "denie[d] any history of substance abuse."

15

schedule, M.G. "stated that she would be able to do that so she could have a day care provider during the day," rather than working at night. On cross-examination, Morgan admitted that although she feels that M.G. "become[s] very overwhelmed when she has all four [children]," this would be a "problem" for "any mother with four children who has to work." And there are no "clinical reasons" that would impair M.G. from being able to parent the children.

Morgan "discharged" M.G. from individual therapy on July 28, 2014, noting that her "diagnosis was phase of life or life circumstances problems," the "discharge" was "regular," and M.G. was "done" with therapy. In other words, Morgan "had set some [therapy] goals" for M.G. and M.G "had achieved those goals" and "made progress." And at the time of M.G.'s discharge, Morgan did not "see any[thing] prohibit[ing]" M.G. from "parenting her children."

Morgan further testified that DFPS subsequently referred M.G. back to her for "more therapy." In January 2015, Morgan noted that M.G. had "progressed with communicating and asserting herself" and asserted it is "her responsibility to take care of her children." M.G. had "identif[ied] changes needed in her routine structure and support system in order to show that she's able to manage taking care of her children[]." And she had "made progress" while working with Morgan. Morgan's main "concern" for M.G. was her lack of a "support system." However, she noted that her concerns would be alleviated if M.G. secured a day-care program for the

16

children. She also noted her concerns would be alleviated if M.G. secured "responsible adults" to "take care of the children" while M.G. is at work.

In regard to J.R.G., Morgan noted that she began seeing him, both individually and with M.G. for "joint session[s]," in 2014, although she could not remember when specifically. She could not recall how many times that J.R.G. had seen her individually, but she estimated that he had attended more than five joint sessions with M.G.[21] During their joint sessions, J.R.G. was "forthcoming" and "clear," and it appeared to Morgan that he "wanted to work on a plan for the kids and [to] be clear about where he stood." Morgan opined that it is not possible for J.R.G. to "parent" "all four" children and "he would be able to take [only] two."[22] And she noted that he did not participate in any therapy with the children through Morgan's services.

M.G. testified that she met J.R.G. in November 2008 and became pregnant with J.J.G. in 2009. At that time, she was not aware that J.R.G. was married to another woman.[23] While she was pregnant, she saw J.R.G. "every now and then,"

---

[21]  In her therapy notes, Morgan indicates that J.R.G. attended "joint session[s]" with M.G. on November 24, 2014, December 8, 2014, December 16, 2014, and December 29, 2014. Further, her notes reflect that J.R.G. was "consistent in attending all sessions."

[22]  In her therapy notes, Morgan further indicates that J.R.G. "preferr[ed] [the] children be[ing] reunified" with M.G., "but if that was not possible[,] then he was willing to take . . . the oldest two because those are the two that know him."

[23]  Only recently did M.G. become aware of J.R.G.'s marital status.

and she "stopped seeing him" for a period of time because "he left" "[t]o work." He provided no support for M.G. before or during her pregnancy with J.J.G. After J.J.G. was born on March 3, 2010, M.G. saw J.R.G. "more frequently" and she became pregnant with L.K.G., who was born on March 5, 2011. Although J.R.G. did not provide M.G. with any financial assistance before or during her pregnancy with L.K.G., she continued to see him. After H.A.G. was born on June 7, 2012, J.R.G. "started to help" M.G. because she "told him he really needed to help" as "there were more children, more expenses, and more responsibility." She explained that she had not previously asked J.R.G. for financial assistance because she had been "working" and "things" were not "difficult . . . financially." After the birth of H.A.G., J.R.G. gave M.G. approximately $400 to $500 every month, "to pay [her] rent or [for] things that [she] needed," and he has "continued to pay [her] rent."

M.G. explained that while she was pregnant with A.G.G., J.R.G., in March 2013, "told" her that he had to "move[] to Mexico," but he continued to send her money "[s]ometimes," "[l]ike [for] about five months."[24] Subsequently, after A.G.G. was born on May 31, 2013, M.G. next saw J.R.G. in January 2014, prior to A.G.G. being injured. She and the children did not "see" J.R.G. from March 2013 to January 2014, but she spoke to him by telephone "every three days." When J.R.G.

---

[24] At times during trial, M.G. contradicted herself, stating that J.R.G. did not "support" her while he was purportedly away in Mexico.

returned in January 2014, he "support[ed]" her again with $400 to $450 per month continuously.[25]

On January 23, 2014, M.G. took A.G.G. to the hospital, and J.R.G. "later" met her there on either January 23rd, 24th, or 25th. He was at the hospital when a "CPS investigator" talked to her, and he knew that DFPS was involved in A.G.G.'s case "from the time that [A.G.G.] was in the hospital." J.R.G. also knew that M.G. was "coming to court for the children" and they "were in the custody of [DFPS]." When M.G. asked him to attend court hearings with her, he was "always working" or told her that it was not necessary for him to attend because "he hadn't done anything" to A.G.G. However, beginning in either July or August 2014, J.R.G. started to attend the court hearings.

M.G. opined that J.R.G. is a "good father," who "loves the children" and "pays attention to them." However, she admitted that it was not "responsible" for him to "disappear for long periods of time," which indicates that he is not "there for his children." And when J.R.G. does visit the children, it is usually for "two or three hours," once or twice a week. When he visits, he watches movies with the children,

---

[25]     M.G. noted that since she and J.R.G. signed an "Irrevocable Children's Protective Services Mediated Settlement Agreement" in February 2015, J.R.G. has been providing her with $1,500 a month. For the four months leading up to trial, J.R.G. had given her $1,500 each month. And the master admitted into evidence money orders reflecting J.R.G.'s payments.

19

plays with them, and devotes time to them. In regard to J.J.G. specifically, J.R.G. had visited him "[m]any" times.

M.G. noted that she is employed as a cook at a restaurant, where she has worked for the past seven years. Earning between $550 and $600 every two weeks, she works in the mornings thirty-five to forty hours per week. M.G. had previously worked at night from approximately 4:00 p.m. or 5:00 p.m. to 11:00 p.m. or 11:30 p.m. However, if the children are returned to her, she will continue to work "[j]ust mornings." During the week prior to trial, she had worked thirty-nine hours, and she had Friday and Sunday "off."

M.G. further testified that her monthly expenses include $435 for rent, $120 for food, $200 for a car payment, $80 for electricity, $80 for gas, and $60 for her telephone. She had put down a deposit for a two-bedroom apartment and was "getting ready to move." And she had "looked into day care" for the children, specifically, Sharpstown Day Care, which the children would attend while she works. M.G. also noted that if the children are returned to her, she will be "pick[ing] them up from school, bath[ing] them, and help[ing] them on their home work."

Prior to the children entering into the care of DFPS, either M.G.'s sister-in-law, Veronica, her friend, Nelly, or another woman, Ramona, took care of the children while M.G. worked. And M.G. cared for the children when she was not at

20

work.[26]  In the two weeks prior to A.G.G. being injured, both Veronica and Nelly, in addition to M.G., had cared for A.G.G., and J.R.G. also saw the children during those two weeks.  And although J.R.G. likely saw the children "a week before" A.G.G. was injured, he was "[a]lmost never" alone with them.

In the beginning of January, M.G., noticing that A.G.G. had returned from Veronica's care with a bruise and a scrape, "thought [that] he might have fallen." The bruise on his forehead was the size of "a dime," and Veronica told her that the scrape had come from "the carpet."[27]  M.G. agreed that A.G.G. had suffered serious injuries in this case, "whoever caused those injuries . . . should be punished," and A.G.G. had been in the care of Veronica, Nelly, and herself during the relevant time period.  Thus, she concluded that "one of the three" of them had injured A.G.G. However, M.G. denied "shak[ing]" A.G.G. and "twist[ing] his ankles," noting that she had "never harmed any of [her] children."  She spoke "two or three times" to law enforcement officers about A.G.G.'s injuries.  And although she "think[s]" that Veronica hurt A.G.G., she could not say so for certain because she "didn't see her harming him or injuring him."  M.G. was also aware that A.G.G. "has to have very special care now" and requires additional surgery related to his eyes.

---

[26]  According to M.G., Ramona only watched the children for "a short period of time" "[a]round . . . November to December" of 2013.

[27]  The master admitted into evidence medical records that show that A.G.G.'s primary care physician saw him on January 17, 2016, reporting that he was not in "apparent distress" and was "well nourished" and "well developed."

21

M.G. noted that she had a "[g]ood" relationship with Veronica, who was still married to M.G.'s brother. She "see[s]" Veronica and "talk[s]" to her "[s]ometimes," but she does not see her on holidays because M.G. does not "go out on holidays," she "just go[es] to work." M.G. further stated that Veronica is not part of her support system "anymore," and since A.G.G. was injured, she does not "turn[] to Veronica for help," rather, she "just talk[s] to her."

Before the children entered into the care of DFPS, a typical day with them, when M.G. was not working, consisted of her making the children breakfast, "go[ing] to the store to run . . . errands" with them, and "visit[ing] with [her] little cousins where [the] children like[d] to go to visit so they could play." M.G. cooked for the children, bathed them, "watch[ed] movies with them," "play[ed] and dance[d] with them," and "sang with them." She described the children as "very active and very happy with [her]."

When M.G. sees the children now during scheduled visits, she brings them food or gifts, and the children display affection towards her. "They are very loving" towards her and tell her, "[M]ommy we love you. I love you. . . . We want to go with you." According to M.G., Franco, the DFPS caseworker, has never been present for any of her visits with the children. And M.G., in addition to any therapy sessions she has with the children, has only been allowed to see the children for two hours per month since they entered into the care of DFPS.

In regard to M.G., the master admitted into evidence a "2054 Psychological Evaluation" report, dated October 22, 2014, stating that M.G. "denie[d] any current alcohol or drug use" and "denied all criterion depression symptoms except for sadness because of [the removal of] her children." The report also states that M.G. has "no report[ed] psychiatric history," "no suicidal or self-injurious ideation and no intent or plan," "[n]o criterion symptoms of bipolar manic phase," "no generalized anxiety," no reported "[p]anic [d]isorder," no reported obsessive compulsive disorder, "[n]o criterion symptoms of posttraumatic stress disorder," "[n]o criterion symptoms" of "[t]hought [d]isorder/[p]sychosis," and no reported "[h]allucinosis." M.G.'s "hygiene appeared reasonably tended to," and throughout the evaluation, she maintained "good" eye contact, her "[a]ttitude was open and cooperative," and her "effort level during [the] interview and mental status testing was good." The report also notes that M.G.'s "[t]hought [p]rocess" is "logical," "coherent," and "goal-directed." And she had a "positive interaction" with the examiner. M.G.'s "[p]rognosis" was determined to be "GOOD"; she did not "demonstrate any signs or symptoms of a psychological condition"; she had "no serious levels of depression, anxiety, or hopelessness"; her "results, when matched against non-patient female norms, indicated no significant psychological distress in any domain"; and she was not diagnosed with a "psychiatric illness" or a "personality disorder."

J.R.G. testified that he has seven children, the youngest four of which are the subjects of the instant case.[28] He explained that although he has been in a relationship with M.G. for approximately seven years, he is married to another woman. Until two years ago, J.R.G. was "a loving father," but he did not assume responsibility for the children. However, before the children entered into DFPS's care, he was "becoming more involved" in their lives because he "wanted" to "take care" of them. Within the last two years, J.R.G. has become "a little closer" to the children and has taken "responsib[ility] for the expenses [that M.G.] incurs because of the children." And for the last two years, he has been "giving [M.G.] . . . money for [her] rent" and $1,500 for the four months prior to trial in accordance with an Irrevocable Children's Protective Services Mediated Settlement Agreement, which he signed. J.R.G. noted that he began providing M.G. with financial assistance after she requested it, and he has no concerns about "any physical danger" to the children if they are returned to M.G. He has never seen any indication that the older children, J.J.G., L.K.G., and H.A.G., were not "well provided for" when they lived with M.G. And J.R.G. indicated that he would continue to stay involved in the children's lives and support them if they are returned to M.G. He is currently employed, installing wood flooring, and he is paid $2,400 per month.

---

[28] J.R.G.'s eldest three children are over eighteen years old.

J.R.G. admitted that he left while M.G. was pregnant with J.J.G. However, he now does not "know what was going on in [his] head" at the time. He also admitted to leaving M.G. after L.K.G. was born. J.R.G. explained that when M.G. was "three months pregnant" with A.G.G., he "stayed away from her [for] about three or four months." However, he began seeing her again in November 2013 and onward, although "not frequently." And while he was "away," he continued to send her money.

J.R.G. was aware that both Veronica and Nelly cared for the children while M.G. was at work. He explained that he became concerned about A.G.G. in "early" January when he saw on A.G.G.'s face a bruise, "[s]maller than a dime," and a "small" "scratch" or "scrape" about "the size of a dime." J.R.G. thought that the bruise and scratch could have happened by "accident" because the children "jump around" A.G.G., and he has told them in the past to be careful. And neither the bruise nor the scratch caused J.R.G. to "fear that [A.G.G.'s] physical and emotional well being were in danger." He did, however, tell M.G. to ask Veronica to be more careful when she cared for A.G.G.

After M.G. took A.G.G. to the hospital on January 23, 2014, J.R.G. arrived "the following day," but he did not learn of DFPS's involvement until "two or three days later," when M.G. told him that "she was going to be investigated." He told "[e]verybody" at the hospital that he was A.G.G.'s father. And although he had

25

"tried to talk to someone" to "tell them or let them know that [he] could pick up [the] children," whoever he spoke to informed him that he "couldn't do anything." Further, DFPS did not interview him about A.G.G.'s injuries. J.R.G. explained that he was not initially involved in the instant case because he did not "think" it involved him and he had been told that he "had nothing to do there." He has seen the children "six or seven times" since they have entered into the care of DFPS, and DFPS and the foster parents have "canceled" appointments with him on certain occasions. J.R.G. stated that he loves the children, he was "concerned" when he heard that A.G.G. was in the hospital, and J.J.G., L.K.G., and H.A.G. are "bonded" with him.[29]

Currently, J.R.G. lives with his wife, who has said that the children cannot live in their home.[30] However, he "would move with [the] children" somewhere "alone," "get an apartment," and provide them with "stable housing" if they are returned to him. J.R.G. explained that although, during the pendency of this case, he had "moved" out of the home he shared with his wife, he subsequently moved back into the home for financial reasons and because one of his daughters was having "problems."[31] J.R.G. agreed that it was not "a good situation to bring four children into th[e] world when [he was] married to somebody else," but stated that the

---

[29]  J.R.G. noted that A.G.G. is "just now beginning" to bond with him.

[30]  J.R.G. noted that his wife would be willing to have two children live in their home.

[31]  J.R.G. explained that his oldest daughter's three children and his other two older children currently live in the home that he shares with his wife.

26

children are "here" now and he has "to take care of them." Further, he had provided his three oldest children with food, shelter, and education, does not have a criminal record, and has "[a]lways" worked.

In regard to A.G.G., J.R.G. did not know who "broke [A.G.G.'s] ankles" or who "shook [A.G.G.] so hard [that] he got multiple brain bleeds." He is very "concern[ed]" about what happened to A.G.G., noting that his since birth, M.G. had been taking A.G.G. to a doctor "regularly," including the week before she took him to the hospital.[32] And J.R.G. visited M.G. "three times" in January prior to A.G.G.'s being injured.

J.R.G. further testified that he attended therapy sessions and has seen Morgan "[a]bout six times," including four individual sessions and two joint sessions with M.G. He also completed the required psychosocial evaluation, and J.R.G. noted that he had had only one "face-to-face" meeting ever with Franco, the DFPS caseworker.

---

[32] A.G.G.'s medical records show that M.G. took A.G.G. to twelve doctor's appointments from the time that he was born to when he was injured at seven months old. The records show that A.G.G. saw his primary care physician for routine "[w]ell child check[s]" and when he suffered from a cough or "wheezing." The medical records also reveal that A.G.G. has received appropriate immunizations and "[h]earing check[s]," and they described him as being "well nourished" and "well developed," with "no apparent distress." At the time he was injured, A.G.G. was in top percentiles for weight and height.

## Standard of Review

The standard of review for the appointment of a non-parent as sole managing conservator is less stringent than the standard of review for the termination of parental rights. *See In re J.A.J.*, 243 S.W.3d 611, 616 (Tex. 2007); *In re A.C.*, 394 S.W.3d 633, 644 (Tex. App.—Houston [1st Dist.] 2012, no pet.). Unlike the standard of proof for the termination of parental rights, the findings necessary to appoint a non-parent as sole managing conservator need only be established by a preponderance of the evidence. *In re J.A.J.*, 243 S.W.3d at 616; *see* TEX. FAM. CODE ANN. § 105.005 (Vernon 2014). Moreover, we review a trial court's appointment of a non-parent as sole managing conservator for an abuse of discretion. *In re J.A.J.*, 243 S.W.3d at 616; *Earvin v. Dep't of Family & Protective Servs.*, 229 S.W.3d 345, 350 (Tex. App.—Houston [1st Dist.] 2007, no pet.). Accordingly, we will reverse a trial court's appointment of a non-parent as sole managing conservator only if we determine that it is arbitrary or unreasonable. *In re J.A.J.*, 243 S.W.3d at 616; *Earvin*, 229 S.W.3d at 350. We view the evidence in the light most favorable to the trial court's decision and indulge every legal presumption in favor of its judgment. *Earvin*, 229 S.W.3d at 350 (citing *Holley v. Holley*, 864 S.W.2d 703, 706 (Tex. App.—Houston [1st Dist.] 1993, writ denied)). A trial court abuses its discretion by ruling without supporting evidence. *Ford Motor Co. v. Garcia*, 363 S.W.3d 573, 578 (Tex. 2012).

When applying an abuse-of-discretion standard, challenges to the legal and factual sufficiency of the evidence are not independent grounds of error but are factors used in assessing whether the trial court abused its discretion. *Mai v. Mai*, 853 S.W.2d 615, 618 (Tex. App.—Houston [1st Dist.] 1993, no writ); *see also McGuire v. McGuire*, 4 S.W.3d 382, 387 n.2 (Tex. App.—Houston [1st Dist.] 1999, no pet.) (sufficiency challenges are incorporated into abuse of discretion determination). To determine whether a trial court abused its discretion because the evidence is legally or factually insufficient to support its decision, we consider (1) whether the trial court had sufficient evidence upon which to exercise its discretion and (2) whether it erred in its application of that discretion. *Bush v. Bush*, 336 S.W.3d 722, 729 (Tex. App.—Houston [1st Dist.] 2010, no pet.); *see also Moroch v. Collins*, 174 S.W.3d 849, 857 (Tex. App.—Dallas 2005, pet. denied). We conduct the applicable sufficiency review when considering the first prong of the test. *Bush*, 336 S.W.3d at 729; *see also In re S.T.*, No. 02-15-00203-CV, --- S.W.3d ---, 2015 WL 9244913, at *6 (Tex. App.—Fort Worth Dec. 17, 2015, no pet.). We then determine whether, based on the evidence, the trial court made a reasonable decision. *In re S.T.*, 2015 WL 9244913, at *6; *Moroch*, 174 S.W.3d at 857.

In a legal-sufficiency review, we consider all of the evidence in the light most favorable to the challenged finding and indulge every reasonable inference that would support it. *City of Keller v. Wilson*, 168 S.W.3d 802, 822 (Tex. 2005). We

consider evidence favorable to the finding if a reasonable factfinder could and disregard evidence contrary to the finding unless a reasonable factfinder could not disregard it. *Id.* at 827; *Brown v. Brown*, 236 S.W.3d 343, 348 (Tex. App.—Houston [1st Dist.] 2007, no pet.). The factfinder is the sole judge of the credibility of the witnesses and the weight to give their testimony. *City of Keller*, 168 S.W.3d at 819. The final test is "whether the evidence at trial would enable reasonable and fair-minded people to reach the verdict under review." *Id.* at 827.

In a factual-sufficiency review, we consider all the evidence for and against the challenged finding and set it aside only if the evidence is so weak as to make the finding clearly wrong and manifestly unjust. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex. 1986). In a bench trial, the trial court is the sole judge of the credibility of the witnesses. *Bush*, 336 S.W.3d at 730; *Sw. Bell Media, Inc. v. Lyles*, 825 S.W.2d 488, 493 (Tex. App.—Houston [1st Dist.] 1992, writ denied).

## Permanent Managing Conservatorship

In their first issues, M.G. and J.R.G. argue that the trial court erred in appointing DFPS as the children's permanent managing conservator because the evidence is legally and factually insufficient to establish that appointment of M.G. and J.R.G. as the children's managing conservators would significantly impair their physical health and emotional development. *See* TEX. FAM. CODE ANN. § 153.131 (Vernon 2014), § 263.404(a) (Vernon Supp. 2015).

30

A managing conservator is a person or entity who, by court order, has been awarded custody of a child and may determine the child's primary residence. *See Phillips v. Beaber*, 995 S.W.2d 655, 660 (Tex. 1999); *In re C.A.M.M.*, 243 S.W.3d 211, 215 n.7 (Tex. App.—Houston [14th Dist.] 2007, pet. denied); *see also* TEX. FAM. CODE ANN. § 153.132 (Vernon 2014) (listing "rights and duties" of parent appointed sole managing conservator), § 153.371 (Vernon Supp. 2015) (listing "rights and duties" of non-parent appointed as sole managing conservator). The managing conservator has nearly sole authority to make decisions for the child. *See* TEX. FAM. CODE ANN. §§ 153.132(1)–(9), 153.371(1)–(11); *see also In re N.L.D.*, 412 S.W.3d 810, 816 (Tex. App.—Texarkana 2013, no pet.) ("Conservatorship of a child includes the day-to-day management of the child.").

The Texas Family Code authorizes the appointment of a managing conservator or joint managing conservators, and it provides that the managing conservator must be a parent, a competent adult, DFPS, or a licensed child-placing agency. TEX. FAM. CODE ANN. § 153.005(a)–(b) (Vernon Supp. 2015). Although rebuttable, the Family Code creates a strong presumption that it is in the child's best interest for his parents to be named joint managing conservators, and it imposes a heavy burden on a non-parent to rebut this presumption.[33] *Id.* § 153.131(a)–(b);

---

[33] "The parental presumption is based upon the natural affection usually flowing between parent and child." *In re V.L.K.*, 24 S.W.3d 338, 341 (Tex. 2000). And "[t]he presumption that the best interest of a child is served by awarding custody to

31

*Lewelling v. Lewelling*, 796 S.W.2d 164, 167 (Tex. 1990); *see also Whitworth v. Whitworth*, 222 S.W.3d 616, 623 (Tex. App.—Houston [1st Dist.] 2007, no pet.) ("There is a strong presumption that the best interest of a child is served if a natural parent is appointed as managing conservator."). In order to rebut the presumption and appoint someone other than a parent as the managing conservator of a child, the party seeking appointment as managing conservator must affirmatively prove, and the trial court must find, that the appointment of a parent would "significantly impair the child's physical health or emotional development."[34] TEX. FAM. CODE ANN. § 153.131(a); *In re J.A.J.*, 243 S.W.3d at 616; *Lewelling*, 796 S.W.2d at 167.

---

a natural parent is deeply embedded in Texas law." *Lewelling v. Lewelling*, 796 S.W.2d 164, 166 (Tex. 1990).

[34] Texas Family Code section 153.004(b) provides:

> It is a rebuttable presumption that the appointment of a parent as the sole managing conservator of a child or as the conservator who has the exclusive right to determine the primary residence of a child is not in the best interest of the child if credible evidence is presented of a history or pattern of past or present child neglect, or physical or sexual abuse by that parent directed against the other parent, a spouse, or a child.

TEX. FAM. CODE ANN. § 153.004(b) (Vernon 2014). Although this provision is inapplicable here, we note that section 153.004(b) does not relieve a non-parent from its burden to prove that it should be appointed managing conservator and the appointment of a parent as managing conservator would significantly impair the physical and emotional development of the child. *See In re J.C.*, 346 S.W.3d 189, 195–96 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (rebuttable presumption did not apply). Moreover, even if the section 153.004(b) presumption were applicable in the instant case, it is still "rebuttable" and does not prevent a parent from being named as managing conservator. *See Baker v. Baker*, 469 S.W.3d 269, 275–76 (Tex. App.—Houston [14th Dist.] 2015, no pet.) (internal quotations omitted) (quoting TEX. FAM. CODE ANN. § 153.004(b)).

Family Code section 263.404 governs a trial court's appointment of DFPS as a child's managing conservator without the termination of parental rights, and it allows the trial court to render a final order appointing DFPS as a child's managing conservator if the court finds that: (1) a parent's appointment would not be in the child's best interest because the appointment would significantly impair the child's physical health or emotional development and (2) the appointment of a relative of the child or another person would not be in the child's best interest.[35] TEX. FAM. CODE ANN. § 263.404(a); *see also In re J.A.J.*, 243 S.W.3d at 614. As evidence, DFPS must offer "specific actions or omissions of the parent that demonstrate an award of custody to the parent would result in physical or emotional harm to the child." *Lewelling*, 796 S.W.2d at 167.

The Texas Supreme Court has noted that although trial courts are "afforded broad discretion in deciding family law questions, the Legislature has explicitly limited the exercise of that discretion when a nonparent seeks appointment as managing conservator." *Lewelling*, 796 S.W.2d at 168. "[C]lose calls" are to be decided "in favor of the natural parent." *Id.*; *see also In re K.R.P.*, 80 S.W.3d 669,

---

[35] Among factors that a court should consider in making the above determination are "the needs and desires of the children." TEX. FAM. CODE ANN. § 263.404(b) (other facts listed do not apply because of children's ages); *In re J.A.J.*, 243 S.W.3d 611, 614 (Tex. 2007).

33

675 (Tex. App.—Houston [1st Dist.] 2002, pet. denied); *In re De La Pena*, 999 S.W.2d 521, 528 (Tex. App.—El Paso 1999, no pet.).

Here, the trial court in its Final Decree made the following relevant findings: (1) the appointment of M.G. or J.R.G. as managing conservators would not be in the best interest of the children because the appointment "would significantly impair the children's physical health or emotional development"; (2) it would not be in the best interest of the children to appoint a relative of the children or another person as managing conservator; and (3) the appointment of DFPS as sole managing conservator of the children is in their best interest.

In regard to the trial court's first finding, the burden of proof, at trial, was on DFPS, which was required to offer evidence of specific actions or omissions of M.G. and J.R.G. showing that awarding custody of the children to them would significantly impair the children, either physically or emotionally. *See Lewelling*, 796 S.W.2d at 167; *In re T.R.B.*, 350 S.W.3d 227, 233–34 (Tex. App.—San Antonio 2011, no pet.); *In re W.G.W.*, 812 S.W.2d 409, 413 (Tex. App.—Houston [1st Dist.] 1991, no writ). Usually, a non-parent must present evidence that shows that the parents' conduct would have a detrimental effect on the children. *May v. May*, 829 S.W.2d 373, 376–77 (Tex. App.—Corpus Christi 1992, writ denied); *see also Lewelling*, 796 S.W.2d at 167. And the link between the parents' conduct and harm to the children "may not be based on evidence which raises mere surmise or

speculation of possible harm." *May*, 829 S.W.2d at 377. Generally, acts or omissions that constitute significant impairment include, but are not limit to, physical abuse, severe neglect, abandonment, drug or alcohol abuse, or immoral behavior by a parent.[36] *In re S.T.*, 2015 WL 9244913, at *9; *In re De La Pena*, 999 S.W.2d at 528; *May*, 829 S.W.2d at 376–77. The material time to consider is the present, and evidence of past conduct may not, by itself, be sufficient to show present unfitness. *In re S.T.*, 2015 WL 9244913, at *9; *see also May*, 829 S.W.2d at 377 ("If the parent is presently a suitable person to have custody, the fact that there was a time in the past when the parent would not have been a proper person to have such custody is not controlling."). Evidence that a non-parent would be a better custodian of the child is "wholly inadequate." *Whitworth*, 222 S.W.3d at 623.

Initially, we note that at the time the children entered into the care of DFPS, J.J.G., L.K.G., and H.A.G. were, in DFPS's words, "healthy and developmentally on target for their ages," and they showed "no signs of abuse or neglect." *See In re S.T.*, 2015 WL 9244913, at *9 ("[T]he parent's treatment of other children may be relevant."). And the medical staff at the hospital where A.G.G. received medical treatment for his injuries similarly "assessed" the three oldest children as

---

[36]  "Other considerations may include parental irresponsibility, a history of mental disorders and suicidal thoughts, frequent moves, bad judgment, child abandonment, and an unstable, disorganized, and chaotic lifestyle that has put and will continue to put the child at risk." *In re S.T.*, No. 02-15-00203-CV, --- S.W.3d ---, 2015 WL 9244913, at *9 (Tex. App.—Fort Worth Dec. 17, 2015, no pet.).

35

"healthy."[37] Franco, the DFPS caseworker, also noted that at the time that they entered into DFPS's care, neither J.J.G., L.K.G., nor H.A.G. showed any "sign[s]" of physical abuse. Further, although J.J.G., L.K.G., and H.A.G. were "diagnosed with anemia" and J.J.G. was considered to be "under weight," DFPS did not consider these issues with the children to be "severe."[38]

In regard to M.G., the evidence shows that she is "a single mother" who has maintained full-time employment as a cook at the same restaurant for the past seven years. *See In re M.J.C.B.*, No. 11-14-00140-CV, 2014 WL 6433378, at *3 (Tex. App.—Eastland Nov. 14, 2014, no pet.) (mem. op.) (trial court abused its discretion in not appointing father as managing conservator where evidence showed financial stability and gainful employment). She is paid every two weeks approximately $550 to $600, which is sufficient to cover her and the children's monthly expenses, even without the financial support of J.R.G. At the time of trial, M.G. had put a deposit down for a larger apartment and was "getting ready to move." She has "no CPS or criminal history" and no history of drug or alcohol abuse, domestic violence,

---

[37]   The Physician's Statement also indicates: "All older children are healthy."

[38]   Although J.J.G., L.K.G., and H.A.G. have participated in speech and individual play therapy since entering into the care of DFPS, the need for such therapy has not been linked to any acts or omissions by M.G. or J.R.G. Further, J.J.G., who was almost four years old at the time he entered into DFPS's care, did not have a "speech delay" and spoke Spanish. And Del Sol, the owner of the children's day-care facility, testified that there was "nothing wrong" with the fact that he liked to "do[] his own activities."

psychiatric or mental health issues, suicidal or self-injurious thoughts or actions, or assaultive behavior. And M.G. does not take any medication. *Cf. In re S.T.*, 2015 WL 9244913, at *9.

The "2054 Psychological Evaluation," completed in October 2014, describes M.G. as having thought processes that are "logical," "coherent," and "goal-directed," an attitude that is "open and cooperative," and a prognosis that is "GOOD." Morgan, M.G.'s therapist, noted that M.G. is "not homicidal," "suicidal," or "aggressive," and she characterized M.G.'s "risk of VIOLENCE" as "very low or absent." At most, M.G. has been described as "overwhelmed" or "stressed," which would be a problem for "any mother with four children who has to work." There are no "clinical reasons" that impair M.G. from being able to parent the children. *Cf. In re R.R.*, No. 02-13-00464-CV, 2014 WL 3953930, at *3–4 (Tex. App.—Fort Worth Aug. 14, 2014, no pet.) (mem. op.) (legally- and factually-sufficient evidence supported finding placement with mother would significantly impair child where mother had history of mental disorders, suicidal thoughts, reoccurring postpartum depression, and no job).

In preparation for the children's return, M.G. has changed her work schedule to ensure that she will only work "mornings," and she has "looked into day care," specifically, Sharpstown Day Care, for the children to attend while she is at work. *See In re S.T.*, 2015 WL 9244913, at *9 ("The material time to consider is the

37

present . . . ."). Prior to the children entering into DFPS's care, M.G. cooked for them, bathed them, "watch[ed] movies with them," "play[ed] and dance[d] with them," "sang with them," and took them to visit other children with whom they liked to play. And if the children are returned to her, M.G. intends to arrange her work schedule so that she can "pick [the children] up from school, bathe them, [and] help them on their home work." *See Lewelling*, 796 S.W.2d at 169–70 (Cook, J., concurring) (no evidence appointment of mother as managing conservator would significantly impair child's physical health or emotional development where "testimony clearly showed that [she] was a good mother" and "kept the child clean, neat, well fed, provided a clean and neat home, took child to the doctor, and was fully capable of providing" for child); *cf. In re R.R.*, 2014 WL 3953930, at *3 (mother "rarely fed, bathed, changed, or helped care for" child).

Since the children entered into the care of DFPS, M.G. has done nearly everything that DFPS has required of her. *See In re S.T.*, 2015 WL 9244913, at *9 ("The material time to consider is the present . . . ."). She has completed her required "psychosocial evaluation," completed the required parenting classes, provided certification of the completed parenting classes to DFPS, has participated in both individual and family therapy, and has provided DFPS with "pay stubs" to verify her employment. And M.G. has informed DFPS of her plans to "transition[]" into a two-bedroom apartment and her intent to "use a day care center" for the children while

38

she is at work. M.G. has also "consistently" attended all of her scheduled visits with the children. *See id.* at *13–14 (evidence factually insufficient to support finding appointment of father as managing conservator would significantly impair child where evidence showed he had appropriate housing and income, completed parenting classes, and only had one requirement of Family Service Plan remaining).

Further, although M.G. received a "regular" "discharge" from individual therapy in July 2014 because her therapist believed that she was "done" and had "made progress,"[39] M.G., when DFPS required her to attend additional therapy, complied. At the time of trial, M.G. was continuing to participate in the additional therapy that DFPS had required. *See id.* (no significant impairment to child where father had not completed entire counseling requirement before trial). Morgan explained that M.G. had been attending, approximately once a week, both individual counseling and family therapy sessions with her for more than a year. According to Morgan, M.G. has "consistent[ly]" and "time[ly]" attended all of her therapy sessions, and her "behavior in the session[s]" has been "cooperative and attentive." In her therapy notes, Morgan describes M.G. as "very active and responsive" during her therapy sessions. By January 2015, M.G. had "progressed with communicating and asserting herself" and had "identif[ied] changes needed in her routine structure

---

[39]     At the time Morgan initially discharged M.G. from therapy, Morgan did not "see any[thing] prohibit[ing]" M.G. from "parenting her children."

and support system in order to show that she's able to manage taking care of [the] children[]." M.G. has "made progress" in her therapy sessions, and her ability to secure a day-care program for the children to attend while she is at work would "alleviate" Morgan's "concerns about [M.G.'s] ability to take care of" the children.

As to why the children should not be returned to M.G., DFPS, at trial, cited M.G.'s past judgment related to "the children's care." *Cf. id.* at *9 ("The material time to consider is the present, and evidence of past conduct may not, by itself, be sufficient to show present unfitness."); *see also In re De La Pena*, 999 S.W.2d at 532 (although parent's past "may not be stellar," this "does not and should not preclude him from his parental role with" child). More specifically, Franco expressed concern about the "falling off the bed" incident with A.G.G., as well as the car seat incident.

M.G. testified that on January 19, 2014, four days prior to her taking A.G.G. to the hospital, he fell off the bed in her home. According to M.G., A.G.G., who was sitting on the bed "by himself," "kind of jump[ed] and . . . ended up on the floor." She explained that she had left him on the bed while she went into the kitchen because A.G.G. "was able to sit on his own and he felt secure or confident to sit on his own." And at that point in his life, A.G.G. was not crawling, had not started to crawl, was not "pulling himself on his stomach," and was only "just beginning to turn[over]." Although M.G. noted that A.G.G. had previously fallen off the bed

when he was "four or five months old," she explained that she now realizes that it was not safe to leave A.G.G. on the bed alone. And Dr. Isaac testified that A.G.G.'s fall off the bed would not have caused any of the injuries that he was evaluated for at the hospital. Further, M.G. was able to "console[]" A.G.G. after the incident, and there were no "obvious changes" with him after the fall. *Cf. In re K.R.B.*, No. 02-10-00021-CV, 2010 WL 3928727, at *11 (Tex. App.—Fort Worth Oct. 7, 2010, no pet.) (mem. op.) ("Although relevant, the evidence of [mother's] past criminal conduct and drug use does not demonstrate that appointing [her as] sole managing conservator at the time of trial would have significantly impaired [child]'s physical health or emotional development."). M.G. also noted that neither J.J.G., L.K.G., nor H.A.G. had ever "f[allen] off the bed or any other surface" while in her care.

In regard to the car seat incident, which occurred on January 18, 2014, five days prior to her taking A.G.G. to the hospital, M.G. explained that she had secured A.G.G. properly in his car seat. However, the car seat was not actually secured or "buckle[d]" into the car correctly, although M.G., at the time, "thought" that it was. When she made a turn while driving, the car seat "fell" "sideways." Notably, A.G.G. was "fine" and properly ate and drank afterwards. And Dr. Isaac again testified that the car seat incident would not have caused any of the injuries for which A.G.G. was evaluated at the hospital.

41

DFPS also expressed concern at trial about M.G.'s past judgment in leaving the children with individuals whom DFPS characterized as "inappropriate caregivers," specifically Norma and Veronica. It appears that M.G. possibly suggested Norma as a placement for the children after A.G.G. was injured. Although Franco characterized Norma as an "[in]appropriate" selection, DFPS did in fact place A.G.G. with Norma for a period of "[f]our months" during which time his needs were met and he sustained no additional injuries.

In regard to Veronica, DFPS's concerns are not unjustified, given that she is one of three individuals, other than M.G. and her friend, Nelly, who is suspected of having injured A.G.G. However, M.G.'s original decision to have Veronica care for the children while she was at work was not necessarily inappropriate, given that Veronica is her sister-in-law, has children of her own, and has "no criminal or CPS history."[40] In fact, DFPS "actually approved placement of the children with Veronica" after A.G.G. had been injured, completed "[a] background check" on her, and had "no safety concerns" after a visit to her home. Although some witnesses

---

[40] Although M.G. admitted that she observed a bruise and a scrape on A.G.G. at the beginning of January when he returned from the care of Veronica, M.G. stated that the bruise was the size of "a dime" and Veronica had told her that the scrape came from "the carpet." After this occurrence, A.G.G.'s primary care physician noted that A.G.G. was "well nourished" and "well developed," with "no apparent distress." Further, Dr. Isaac, in regard to the fractures to A.G.G.'s tibias, noted that a parent would not have been able to notice them. And, in regard to the "retinal hemorrhaging" suffered by A.G.G., Isaac similarly opined that it would have been impossible for a parent to have been able to detect it from "looking at the child."

testified regarding their concerns about Veronica's current and future role in M.G.'s life as a "support system[]," M.G. appears to have accepted the fact that Veronica likely injured A.G.G. She testified that Veronica is not a part of her support system "anymore," she does not "turn[] to Veronica for help" since A.G.G. was injured, and although Veronica is still married to M.G.'s brother, she does not see her on holidays. *See May*, 829 S.W.2d at 377 (link between parent's conduct and harm to child "may not be based on evidence which raises a mere surmise or speculation of possible harm"). Further, M.G. explained that she will be sending the children to a day-care facility in the future while she is at work and will not be relying on Veronica to watch the children.

Finally, in regard to A.G.G., based on the evidence presented at trial, there is no doubt that he sustained serious injuries at the hands of an adult, but an adult who is "unknown." At trial, the parties seemed to focus on three individuals, M.G., Veronica, and Nelly, as suspects. M.G. repeatedly told Morgan, her therapist, that "she did not hurt" A.G.G., and M.G. "has not said anything" nor done "anything" that has "caused [Morgan] to believe" that M.G. caused A.G.G.'s injuries.[41] Morgan characterized M.G. as being "devastated" by what happened to A.G.G., and she noted that M.G. "cares [for] and loves" the children. At trial, M.G. denied

---

[41]     In her therapy notes, Morgan states that "the possibility of [M.G.] having been the one to hurt her child[] is low."

"shak[ing]" A.G.G. and "twist[ing] his ankles," and she testified that she has "never harmed any of [her] children." M.G. has willingly spoken with law enforcement officers, "the social worker at the hospital," and other DFPS investigators about A.G.G.'s injuries. And "no one has [ever] been charged . . . for [a] crime" related to A.G.G. Further, Dr. Isaac noted that M.G. "appropriate[ly]" sought medical treatment for A.G.G. once his symptoms moved beyond "irritability," which could have been related to nothing more than his cough. And since A.G.G.'s birth, M.G. has consistently taken him to doctor's appointments for "[w]ell child check[s]," for immunizations, and when he was experiencing coughing and "wheezing." In fact, A.G.G. had seen his primary care physician a week prior to his arrival at the hospital. *Cf. In re R.D.Y.*, 51 S.W.3d 314, 321 (Tex. App.—Houston [1st Dist.] 2001, pet. denied) (retention of mother as sole managing conservator detrimental to welfare of child where mother left child, dirty and hungry, alone at church, child was afraid of mother, mother forced child to bathe in bleach, and mother displayed signs of violence).

In regard to J.R.G., the evidence at trial showed that he is currently employed and is paid $2,400 per month. *See In re M.J.C.B.*, 2014 WL 6433378, at *3 (trial court abused its discretion in not appointing father managing conservator where evidence showed gainful employment and financial stability). Since H.A.G. was born in June 2012, and M.G. began requesting financial assistance, J.R.G. has been

paying her approximately $400 to $500 every month to cover her rent and for "things that [she] needed." According to M.G., J.R.G. has "continued to pay [her] rent" since the birth of H.A.G. Further, since he signed the Irrevocable Children's Protective Services Mediated Settlement Agreement in February 2015, J.R.G. has paid M.G. $1,500 each month in accordance with the terms of that agreement. There is no evidence that J.R.G. has a history of drug or alcohol abuse or mental illness, a criminal history, a CPS history, or a history of suicidal thoughts or self-injurious behavior. *Cf. In re S.T.*, 2015 WL 9244913, at *9 (listing acts or omissions constituting significant impairment); *In re De La Pena*, 999 S.W.2d at 528 (same). Nor did DFPS present any evidence at trial that J.R.G. is an aggressive or violent person. And J.R.G. provided his three oldest children, who are over the age of eighteen, with food, shelter, and education. *See In re S.T.*, 2015 WL 9244913, at *9 ("[T]he parent's treatment of other children may be relevant.").

At trial, DFPS, in regard to its concern about returning the children to him, cited J.R.G.'s lack of "active[] participat[ion]" and lack of "desire to care for all four of his children." According to Franco, the DFPS caseworker, J.R.G. had not "consistently been a part of the children's lives," had not "provided them with financial support," and had not "consistently visited them or formed a bond with them."

J.R.G. readily admitted that in the past he did not assume responsibility for the children and the evidence showed that he would disappear from the children's lives for periods of time since M.G. became pregnant with J.J.G. in 2009. However, this does not constitute evidence of significant impairment. *See Lewelling*, 796 S.W.2d 165–69 (mother's failure to see child for two months not evidence appointment of her as managing conservator would significantly impair child); *In re M.J.C.B.*, 2014 WL 6433378, at *2–3 (father's absence from children's lives for approximately two years not evidence appointment of him as managing conservator would significantly impair children's physical health or emotional development); *Brigham v. Brigham*, 863 S.W.2d 761, 764 (Tex. App.—Dallas 1993, writ denied) ("The fact that [m]other left town without telling anyone of her exact whereabouts . . . is not evidence of significant impairment to the children. . . . The fact that [mother] was not available for telephone calls . . . is not evidence that placement with [her] would emotionally impair the children."); *see also May*, 829 S.W.2d at 377 ("If the parent is presently a suitable person . . . , the fact that there was a time in the past when the parent would not have been a proper person to have . . . custody is not controlling."). Further, J.R.G. testified that within the last two years, he has become "a little closer" with the children and has taken "responsib[ility] for the expenses [that M.G.] incurs because of the children." *Cf. In re J.A.J.*, No. 04-14-00684-CV, 2014 WL 7444340, at *3 (Tex. App.—San Antonio

46

Dec. 31, 2014, no pet.) (mem. op.) (evidence mother failed to pay child support not evidence of specific acts or omissions demonstrating awarding her conservatorship would result in physical or emotional harm to her children).  And during the periods when J.R.G. was absent, M.G. noted that she would still speak with him by telephone.  When J.R.G. did visit the children, it was usually for several hours once or twice a week, and he would "watch movies" with them, "play with them," and "devote[]" time to them.  According to M.G., J.R.G. has visited J.J.G. "[m]any" times and "loves the children."  Prior to the children entering into the care of DFPS, he saw them in January 2014, and he has seen the children since that time, albeit not as frequently as M.G.

Further, J.R.G. testified that he would continue to stay involved in the children's lives and support them if they are returned to M.G.  Although it does not appear that all of the four children would be able to move into the home that J.R.G. shared with his wife at the time of trial, J.R.G. did testify that he "would move with [the] children" somewhere else "alone," "get an apartment," and provide them with "stable housing" if they are returned to him.[42]

In regard to A.G.G., DFPS did not present evidence to establish that J.R.G. was responsible in any way for the injuries sustained by A.G.G.  And J.R.G. testified

---

[42]     J.R.G. also testified that, at the very least, the two oldest children would be able to live with him at the home that he shares with his wife.

that he did not know who "broke [A.G.G.'s] ankles" or who "shook" A.G.G. J.R.G. was very "concern[ed]" about what had happened to A.G.G., and he went to the hospital to see A.G.G. after the child was injured.

We note that the children have been in the care of DFPS since A.G.G. was injured in January 2014. At the time that they entered into DFPS's care, J.J.G., L.K.G., H.A.G., and A.G.G. were three years old, two years old, one year old, and less than one year old, respectively. Although it appears that the children have been well cared for since that time, the fact that DFPS might be a better custodian of the children is not enough to show that the children will be significantly impaired by the appointment of M.G. and J.R.G. as their managing conservators. *Lewelling*, 796 S.W.2d at 167; *Whitworth*, 222 S.W.3d at 623. Nor is the fact that the children have lived the majority of their lives outside the care of their parents or that M.G. and J.R.G. have had limited time with the children because DFPS has never increased their visitation time since the children entered into its care. *See Lewelling*, 769 S.W.2d at 167; *see also In re B.B.M.*, 291 S.W.3d 463, 467–68 (Tex. App.—Dallas 2009, pet. denied) ("[Any] focus on potential harm caused by the child's removal [from the current placement] is misplaced. The proper focus . . . is solely upon whether the placement of the child with the natural parent would significantly impair the child's physical health or emotional development."); *Harris v. Tex. Dep't of Family & Protective Servs.*, 228 S.W.3d 819, 829 (Tex. App.—Austin 2007, no pet.)

48

(noting child "comfortable" in non-parent home, but "has also been denied contact with his natural parent [for years], and this lack of contact is a result of [DFPS's] decisions," not parent's decisions). Further, here, there is no evidence that uprooting the children from their current placement will rise to the level of significant impairment to their emotional development. *See In re J.C.*, 346 S.W.3d 189, 194–95 (Tex. App.—Houston [14th Dist.] 2011, no pet.) (no evidence removal of child from non-parent "would be 'devastating' or akin to 'psychological amputation' or cause 'serious psychological damage'" (quoting *In re Rodriguez*, 940 S.W.2d 265, 273 (Tex. App.—San Antonio 1997, writ denied))); *Gray v. Shook*, 329 S.W.3d at 198 (trial court abused its discretion where evidence showed only possible harm to child by "uprooting" and not any specific, identifiable act or omission, conduct or behavior of parent (internal quotations omitted)).

After considering the evidence in the light most favorable to the judgment, we conclude that the evidence is legally insufficient to support the trial court's findings that the appointment of M.G. and J.R.G. as managing conservators of the children would significantly impair the children's physical health or emotional development. Accordingly, we hold that the trial court abused its discretion in appointing DFPS as the sole managing conservator of the children. *See In re M.W.*, 959 S.W.2d 661, 665 (Tex. App.—Tyler 1997, writ denied) ("[T]he right of a parent to raise his or her

child is an 'essential right' and a 'basic civil right of man' and woman." (quoting

*Stanley v. Illinois*, 405 U.S. 645, 651, 92 S. Ct. 1208, 1212–13 (1972)).

We sustain M.G.'s and J.R.G.'s first issues.[43]

---

[43] Given our disposition of M.G.'s and J.R.G's first issues, we need not address the remaining arguments and issues presented by the parties. *See* TEX. R. APP. P. 47.1.

**Conclusion**

We reverse the portion of the trial court's Final Decree awarding sole managing conservatorship of the children to DFPS. And we remand the case to the trial court for rendition of an order appointing M.G. and J.R.G. as joint managing conservators of the children and for further proceedings consistent with this opinion. *See Shook*, 381 S.W.3d 540, 543 (Tex. 2012) (remanding cause); *Lewelling*, 796 S.W.2d at 168–69 (remanding for rendition); *In re A.D.P.*, No. 11-12-00273-CV, 2013 WL 870689, at \*4–5 (Tex. App.—Eastland Mar. 7, 2013, no pet.) (mem. op.) (reversing trial court's order awarding managing conservatorship of children to DFPS and remanding for rendition after holding DFPS "failed to offer legally . . . sufficient evidence to support [the trial court's finding] . . . that the appointment of [parent] as the managing conservator of [the children] would significantly impair their physical health and emotional development").


Terry Jennings
Justice

Panel consists of Chief Justice Radack and Justices Jennings and Lloyd.

51